People v Parris (2024 NY Slip Op 24322)

[*1]

People v Parris

2024 NY Slip Op 24322

Decided on December 20, 2024

Supreme Court, Monroe County

Schiano, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on December 20, 2024
Supreme Court, Monroe County

The People of the State of New York,

against
Jeffrey P. Parris, Defendant.

Ind. No. 72961-24

For the People:
Jonathan Jirik, Esq.
Assistant District Attorney
SANDRA DOORLEY, ESQ.
Monroe County District Attorney
47 S. Fitzhugh Street
Rochester, New York 14614
For the Defendant:
Kenneth Pennica, Esq.
P.O. Box 10755
Rochester, New York 14610

Charles A. Schiano, Jr., J.

Defendant Jeffrey Parris is charged by the above-referenced Indictment with two counts of Driving While Intoxicated in violation of Section 1192(3) of the Vehicle and Traffic Laws of the State of New York. The Defendant moved the Court for an order to suppress tangible evidence and statements. The court granted a combined Mapp hearing (Mapp v Ohio, 367 US 643 [1961]) and Huntley (People v Huntley, 15 NY2d 72 [1965]) hearing which was held on November 13, 2024. The People presented the testimony of Trooper Jonathan Sikorski of the New York State Police (NYSP). The defense called no witnesses. The Court made no findings of fact and conclusions of law at the close of the proceedings.
After due consideration of the evidence presented at the hearing and the applicable law, the court makes the following findings of fact and conclusions of law with respect to defendant's motions.
Findings of Fact
On May 7, 2024, Trooper Sikorski responded to the eastbound lane of Route 104, near North Road in response to a 911 call placed by civilian witness. The witness' 911 call reported a reckless driver whom he suspected was intoxicated. Upon arriving in the area, Trooper Sikorski observed a 2009 Subaru Forester parked on shoulder of the right-hand lane with a civilian on a black and white police-style motorcycle equipped with flashing amber lights parked behind it. 
The motorcycle rider was the 911 caller. The motorcycle was specially equipped with the amber lights and belonged to the witness' funeral escort service company. The witness had no law enforcement or governmental affiliation. The witness explained that he was coming home from work and approached the red Subaru from the rear. He observed the red Subaru was swerving from lane to lane and sometimes on to both shoulders of the highway. The east and west bound lanes of traffic were divided by a grassy median. The witness attempted to pass the Subaru, which he said was traveling about 35 miles per hour, by using the left hand lane and was almost sideswiped.
The witness was in possession of the keys to the Subaru. Trooper Sikorski took possession of the keys and told the witness he was free to leave. 
The Trooper approached the Subaru and observed the driver was the sole occupant. He asked the driver for his license and vehicle registration. The driver provided a New York State identification card. Trooper Sikorski identified defendant in court as the driver of the Subaru he spoke to on the side of the road. 
During the conversation, Trooper Sikorski testified that he observed an odor of alcohol emanating from the interior of the vehicle. He further testified that defendant spoke at a slow rate and had watery eyes. Trooper Sikorski asked from where he was coming, and defendant replied he was returning home from work. Trooper Sikorski asked if defendant had been drinking that night and defendant said there was a "tasting" at work and that he probably had in total, considering the wines he sampled, a glass or two total. Defendant also admitted that he drank two Miller Lite beers. Upon further questioning by Trooper Sikorski, defendant said he had not eaten since breakfast. Trooper Sikorski asked defendant to step out of the car.
Defendant exited the vehicle and walked with a noticeable limp, explaining that one of his ankles had been surgically repaired. The Trooper then administered three standardized sobriety tests. On the horizontal gaze nystagmus test, Trooper Sikorski testified defendant exhibited six of six clues. On the walk and turn test, Trooper Sikorski testified defendant exhibited four of eight clues and on the one leg stand test, two of four clues. Following these tests, Trooper Sikorski asked if defendant would submit to a preliminary breath test. Defendant declined. Trooper Sikorski then placed defendant under arrest.
Handcuffs were applied and defendant was seated in the back of Trooper Sikorski's patrol vehicle. In the patrol vehicle, defendant stated that he knew he should not have been driving, but asked whether there was anyway the Trooper could just follow him home.
Trooper Sikorski then exited the vehicle and searched defendant's vehicle. When he returned, he informed defendant he was under arrest for DWI and asked whether defendant would consent to take a chemical test. Defendant declined. Refusal warnings were given and defendant again declined. Miranda rights and warnings were then given. Defendant said he understood but declined to speak with the Trooper.
On May 16, 2024, Trooper Sikorkski went to the witness' residence to obtain a statement. The witness told Trooper Sikorski that he was returning home from work when observed the [*2]Subaru car swerving back and forth between the lanes and traveling at 35 — 40 miles per hour. The posted speed limit was 55 miles per hour. He further stated that he attempted to pass the Subaru on the left but was almost hit when the Subaru swerved out of the right lane into the left lane. The witness then stated he "lit him up," that is, activated his flashing amber emergency lights. The red Subaru pulled over and the witness came to a stop behind it. He exited his motorcycle and approached the driver's side. The witness then recalled the dialogue between himself and defendant. 
According to the witness, he asked, "how you doing tonight" and defendant said "fine." The witness then asked "how much have you had to drink." Defendant replied "a couple" and the witness then asked where he was coming from. Defendant told him "the Hilton."
The witness then said, "can you turn your car off?" Defendant replied "yes, sir" and turned his car off and placed the keys on the console. The witness then said "hand me your keys, please." Defendant again said "yes, sir" and handed his keys to the witness. The witness told defendant to "sit tight for a minute" and returned to his motorcycle and called 911.
When police had not arrived for fifteen minutes, the witness again approached the Subaru, this time from the passenger side. He opened the passenger side door and told defendant to "sit tight, it's going to be a little longer." The witness replied "yes, sir." According to the witness, Trooper Sikorski arrived 25 minutes after he called 911.
The witness further stated that at no time did he say to defendant that he was a police officer. 
Conclusions of Law
"In evaluating police conduct, a court must determine whether the action taken was justified in its inception and at every subsequent stage of the encounter" (People v Dixon, 203 AD3d 1726, 1726-1727 [4th Dept 2022][quotations and citations omitted]).
The Court of Appeals has set forth a framework of "four levels of police-citizen encounters and the attendant, escalating measures of suspicion necessary to justify each" (People v Garcia, 20 NY3d 317, 322 [2012]; People v De Bour, 40 NY2d 210; People v Hollman, 79 NY2d 181 [1992]). "If a police officer seeks simply to request information from an individual, that request must be supported by an objective, credible reason, not necessarily indicative of criminality [level one]. The common-law right of inquiry, a wholly separate level of contact, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion [level two]. Where a police officer has reasonable suspicion that a particular person was involved in a felony or misdemeanor, the officer is authorized to forcibly stop and detain that person [level 3]. Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized [level four]" (People v McIntosh, 96 NY2d 521, 525 [2001] [internal quotations omitted][emphasis supplied]). A police officer approaching a parked vehicle is analogous to an officer approaching a citizen on the street and the four-tiered analysis set forth in De Bour is applied (People v Ocasio, 85 NY2d 982, 985 [1995]).
Defendant here raises no arguments that Trooper's conduct in approaching defendant's vehicle, conducting a DWI investigation, and arresting defendant was unlawful. "It is well settled that the right to stop a moving vehicle is distinct from the right to approach the occupants of a parked vehicle. Where police officers approach a vehicle that is already parked and stationary, the only level of suspicion necessary to justify that approach is an articulable, credible reason for doing so, not necessarily indicative of criminality" (People v Witt, 129 AD3d 1449, 1450 [4th Dept 2015][quotations omitted]). 
The court concludes that the Trooper had an articulable and credible reason for approaching defendant based on the witness' 911 call relating observations of reckless driving and the witness was on the scene and identified himself to the Trooper. Nor does the Court perceive any lack of justification in the Trooper's request that defendant submit to roadside intoxication tests and the subsequent arrest of defendant for driving while intoxicated.
Defendant argues that the witness falsely portrayed that he was affiliated with law enforcement in order to effect a citizen's arrest by pulling defendant over and taking his keys and therefore all evidence and statements flowing therefrom must be suppressed. Additionally, defendant argues that by such false portrayal, taking on the mantle of law enforcement by his words and actions, the witness also took on the commensurate duties and obligations of law enforcement as regards defendant's constitutional rights (Defendant's Written Summation, December 9, 2024, ¶11).
Defendant chiefly relies upon the Appellate Division, Fourth Department, decision in People v Page, 166 AD3d 1472 [4th Dept 2018]). In that case, a federal marine agent, a law enforcement officer, conducted a traffic stop of a vehicle he witnessed operating in a reckless manner (id. at 1472). The marine agent telephoned the Buffalo Police Department (BPD) and advised them of his observations (id). When the vehicle left the highway, the marine agent followed and became concerned for public safety due to the reckless driving (id). He activated his red and blue emergency lights on his unmarked department vehicle to cause the vehicle to pull over (id). When a Buffalo police officer arrived on the scene, the marine agent approached the pulled over vehicle with the officer for safety reasons (id). When more BPD officers arrived, the marine agent was told he was not needed and left the scene (id. at 1472-1473). A firearm was ultimately found in the vehicle and the occupants were charged with Criminal Possession of a Weapon in the Second Degree (id. at 1473).
On defendants motion, Supreme Court suppressed the physical evidence seized as a result of the traffic stop on the grounds the traffic stop was unlawful (id.). "In concluding that the agent unlawfully stopped the vehicle, the court determined that the agent had the powers of a peace officer, but that the traffic stop could not be justified on that basis because the agent was not acting pursuant to his special duties or within the geographical area of employment" (People v Page, 166 AD3d at 1473). Further, the traffic stop could not be justified a valid citizen's arrest because the agent, who was a peace officer, used his emergency lights and approached the stopped vehicle with the BPD officer and "therefore acted under color of law and with the accoutrements of official authority rather than as a private citizen" (id.).
The People appealed and argued the agent was not a peace officer, did not possess the powers thereof, and therefore the court erred in determining "that the traffic stop could not be justified as a valid citizen's arrest (id. at 1473). The Appellate Division affirmed and held that even assuming the agent was not a peace officer, Supreme Court properly determined that the agent did not effect a valid citizen's arrest (id. at 1474). The Appellate Division concluded that the agent was not acting lawfully because private citizens may not display red and blue emergency lights on their vehicles (Vehicle and Traffic Law § 375[4]) (id. at 1473-1474). In addition:
a private person may not falsely express by words or actions that he or she is acting with approval or authority of a public agency or department with the intent to induce another to submit to such pretended official authority or to otherwise cause another to act in reliance upon that pretense (see Penal Law § 190.25 [3]
(People v Page, 166 AD3d at 1474). 
Lastly, the Appellate Division affirmed the suppression decision reasoning that violation of the citizen's arrest statute in that case had 4th amendment implications concluding.
that adherence to the requirements of the statute implicate the constitutional right to be free from unreasonable searches and seizures (id. at 475 [citing US Const 4th Amend; NY Const, art 1, § 12) by precluding a person who "act[ed] under color of law and with all the accouterments of official authority" from justifying an unlawful search or seizure as a citizen's arrest.
People v Page, 166 AD3d at 1475 [quoting People v Williams, 4 NY3d 535,539 [2005]. 
The Court of Appeals reversed (People v Page, 35 NY3d 199 [2020]). The Court held that as Supreme Court and the Appellate Division both relied on Williams to support suppression of physical evidence, it was necessary to determine whether Williams was correctly applied by the lower Courts (Page, 35 NY3d at 201). The Court held that Williams was inapposite and therefore did not support Supreme Court's suppression decision and the Appellate Division's Affirmance (id.).
The key consideration in applying Williams, according to the Court of Appeals, was whether the marine agent was a peace officer (id.). The Court of Appeals took the view that its decision in Williams applied to law enforcement officers who were peace officers operating outside their special duties or outside the geographical area of employment (People v Page, 35 NY3d at 204). In Page, the Court found that the marine agent was not in fact a peace officer and therefore the analysis in Williams inapposite and could not be used to justify suppression in the Page case (id.). 
The Court of Appeals in Page took care to note that it was not opining on whether the stop in that case comported with constitutional principles or the express terms of the arrest statutes (People v Page, 35 NY3d at 209). Here, defendant contends there should be some constitutional concern because the witness did not comport with the arrest statutes and relies on the Appellate Division decision in Page (Page,166 AD3d 1472). 
In this case, however, unlike Page (166 AD3d 1472), the witness is not a law enforcement, or peace officer, or governmental actor of any kind. The 4th Amendment protections against unlawful search and seizures apply as against government entities and do not restrict the actions of private citizens (Burdeau v McDowell, 256 US 465, 475 [1921][" The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies"]). An exception may be where the private citizen is working at the behest or in conjunction with the government, but that is not at issue here. The Appellate Division decision in Page concerns a government official or "law enforcement officer" and whether that "law enforcement officer" may use citizen's arrest powers to justify his seizure of the defendant's vehicle. Because the "law enforcement officer" did not follow the statutes, the defendants constitutional rights were violated (People v Page, 166 AD3d at 1474-1475). The witness here is not a peace officer or a law enforcement officer of any kind, but a genuine private citizen, accordingly there are no constitutional level implications that attach to the witness' actions, regardless if he violated any arrest statute. 
Upon the Court's review of the body worn camera recording of Trooper Sikorski as he [*3]took the witness' statement (People's Exhibit 1), the only colorable violation of the citizen's arrest statutes is that the witness did not inform defendant of the charge for which he stopped and detained him (CPL § 140.35[2]). Other than that provision, and provisions limiting the use of force, the Court of Appeals in Page noted that there is "nothing in the citizen's arrest statutes themselves [that] sets forth the methods that must be employed when, as here, a crime is committed in the responding citizen's presence (Page, 35 NY2d at 208). As noted by the Court of Appeals in Page, it is the legislature "which has the power to place additional constraints on a citizen's ability to effect an arrest" and the Court cannot read a provision the legislature did not see fit to enact (People v Page, 35 NY3d at FN4). 
Even if the witness violated CPL § 140.35(2), dismissal of this case is not a remedy as a violation of the citizen's arrest statute does not implicate defendant's constitutional rights. The two-judge dissent in Page noted this result of the majority's decision, and were concerned that
any citizen who is not a police or peace officer, even one who has no law enforcement training or qualification whatsoever, falls outside the Williams restrictions. Under this logic, a private citizen who has illegally installed emergency lights in a private vehicle may roam the streets, pulling over drivers for perceived traffic violations. If successful in stopping a driver who is then arrested by the police, the vigilante may possibly be prosecuted at the discretion of the authorities (the same authorities who have exploited the stop), but the constitutional protections of the Fourth Amendment would not apply. . . .
In short, it was proper for the Williams Court to emphasize the outward characteristics of official authority, rather than the technical definition of peace officers on which the majority now relies, and to provide a more powerful deterrent to vigilantism in the suppression of the fruits of such illegal conduct.
People v Page, 35 NY3d at 199, in dissent Fahey, J.
As to the Huntley portion of the hearing and defendant's motion to suppress statements, the Court has reviewed the testimony and body worn camera footage of the circumstances of the statements made by defendant to the Trooper. Defendant's statements as to the amount of alcohol he had consumed were in response to permissible investigative questions and will not be suppressed. A defendant temporarily detained at a roadside investigation, including a suspected DWI offense, is not considered to be in custody and the limited questioning appropriate to such an investigation and the administration of performance tests do not require Miranda warnings (People v Parris, 26 AD3d 393 [2d Dept 2006], lv den 6 NY3d 851). Defendant's statement that he knew he should not have been driving was spontaneous."Such statements must be proven to be 'spontaneous in the literal sense of that word as having been made without apparent external cause, . . . [and] it must at least be shown that they were in no way the product of an 'interrogation environment.'" "Rather, [the statement] must satisfy the test for a blurted out admission, a statement which is in effect forced upon the officer" (People v Ibarrondo, 150 AD3d 1644, 1645 [4th Dept 2017][citing People v Stoesser, 53 NY2d 648, 650 (1981) and People v Grimaldi, 52 NY2d 611, 617,(1981)]). Here, from the Trooper's testimony and after review of the Trooper's BWC, defendant's statements was made not in response to any question by the Trooper and is, therefore, also not subject to suppression under Huntley.
Accordingly, it is
ORDERED that defendant's motion is denied.
The above constitutes the Decision and Order of the Court.
Dated: December 20, 2024.
Rochester, New York
HONORABLE CHARLES A. SCHIANO, JR.
Supreme Court Justice